296 So.2d 418 (1974)
The PARISH OF CALCASIEU, Through the CALCASIEU PARISH POLICE JURY, et al.
v.
Joseph N. TRAIGLE, Collector of Revenue for the State of Louisiana.
No. 9817.
Court of Appeal of Louisiana, First Circuit.
May 28, 1974.
Rehearing Denied July 3, 1974.
*419 Warren L. Mengis, Baton Rouge, for defendant-appellant.
Carlos G. Spaht and Paul H. Spaht, Baton Rouge, for plaintiff-appellant.
Fred H. Sievert, Jr., Lake Charles, for plaintiff Consolidated Aluminum Corp.
Before LOTTINGER, BLANCHE and de la HOUSSAYE, JJ.
de la HOUSSAYE, Judge.
After having read the lower Court's reasons for judgment we are firmly of the opinion that all material points presented by this appeal are covered therein and we therefore quote the District Court's pertinent reasons with approval and adopt them as our own:
"Plaintiffs in this case are the Parish of Calcasieu (the Parish), a political subdivision of the State of Louisiana, appearing through its duly constituted governing body, the Calcasieu Parish Police Jury, Consolidated Aluminum Corporation, previously Gulf Coast Aluminum Corporation (GCA), and numerous contractors and subcontractors (to be referred to collectively as the "contractors" who are suing the Collector of Revenue for the State of Louisiana (the Collector) to have refunded to them certain monies they paid under protest to defendant on September 7, 1972, representing sales and use taxes disputedly owed to the Collector on purchases by the contractors in connection with their contracts for the construction of a consumable carbon electrode and aluminum reduction plant in the Parish of Calcasieu, financed and built pursuant to the provisions of the Louisiana Industrial Inducement Act."[1]
"A lease agreement between the Parish and GCA was entered into on September 1, 1967, wherein it was agreed that the plant would be leased to GCA by the Parish, which would finance the construction of *420 the facility under authorization granted it in the aforesaid Industrial Inducement Act (see footnote 1)."
"In early June of 1969, Frank T. Salter, Jr., as District Attorney and legal advisor for the Parish, wrote a letter to GCA directing said corporation not to include in the contracts being granted to the contractors any sums for the payment of sales and use taxes to the State of Louisiana or any of its political subdivisions in connection with the construction of the plant. Mr. Salter further directed GCA to advise its contractors and sellers that the Parish would not pay sales and use taxes on any purchases in connection with the carrying out of said contracts. A copy of this letter was sent to the Department of Revenue (the Department) by GCA on June 4, 1969. It was referred by S. Feinblum, Director of the Sales Tax Division, to John Levy, General Counsel for the Department, on June 10, 1969. On June 13, 1969, Levi A. Himes, attorney for the Department, by letter addressed to Mr. Salter, disputed the correctness of Mr. Salter's opinion, stating that the Collector would insist that the taxes be paid. Copies of this letter were sent GCA and to the Calcasieu Parish School Board." (SIC.)
"The taxes allegedly due, growing out of the erection of the plant, were broken down into three categories by the State: Category 1 consists of sales made directly to the Parish by out-of-state and foreign dealers and suppliers; Category 2 consists of purchases by contractors and subcontractors in connection with their contracts and subcontracts for the construction of the plant; Category 3 consists of sales made directly to the Parish by Louisiana dealers and suppliers. The instant matter concerns only those taxes arising under Category 2."
"A payment of $71,825 was made to the Department on August 25, 1970, by GCA, said amount being credited by the Collector to Category 1 use taxes. Plaintiffs were unaware of the allocation of the credit at the time it was made and contend that this payment, if not a complete settlement of the taxes and interest due, should have been credited to Category 2. This sum represented a proposed assessment of $65,000 plus interest to August 30, 1970, of $6,825."
"In June, 1972, the Parish decided to pay under protest the Category 2 taxes.[2] A resolution of the Calcasieu Parish Police Jury dated June 29, 1972, authorized payment of the Category 2 taxes but in an amount less than that claimed due by the Collector. The Parish paid the lesser amount because of its claim for credit of monies already paid by petitioners to the Department and because it did not allow for *421 a penalty allegedly due the Collector. Payment was made by check on June 30, 1972; this check was returned to the Parish through its attorney on July 19, 1972, for the reason put forth by the Collector that a tax debtor paying an assessment under protest must pay the amount found due by the Collector. The Parish acceded to this argument and, on September 7, 1972, the additional amount claimed by the Collector was paid under protest in Category 2 to $494,720.04. This figure represented an alleged sales tax debt of $382,731.26 plus interest in the amount of $104,273.43 and a penalty of $7,715.36. The penalty pertained to one of the contractors, Planet Corporation, which had not filed timely tax returns."
"On October 5, 1972, within the thirty (30) day period created in R.S. 47:1576 (see footnote 2), petitioners brought suit against the Collector for refund of the taxes, interest and penalty paid under protest. The Collector reconvened, seeking an additional charge for attorney fees of ten (10%) percent of the taxes, interest and penalty allegedly due, under the prerogative given the Collector, in LSA-R.S. 47:1512,[3] to employ private counsel to assist in the collection of such sums at the expense of the tax debtor. Private counsel had been retained by the Collector on July 5, 1972."
"In plaintiffs' main demand, numerous special defenses are asserted and advanced as sufficient to destroy or negate any finding of liability on their part for the taxes in Category 2. These averments by plaintiffs are outlined as follows: [1] that the actions of the State's agents and employees in the compromise negotiations and settlement gave rise to a conventional and/or tacit remission of any debt that was then due the State; [2] that plaintiffs cannot be held liable for the interest and penalty because of their good faith throughout the construction of the plant; [3] in the alternative, that if any interest is owed, the interest rate to be applied for all taxes which became due prior to July 29, 1970, is 6% rather than 12%; [4] in the alternative, that monies previously paid should be credited to taxes in Category 2; [5] that the attorney for the Collector is not entitled to attorney fees under LSA-R.S. 47:1512."
Both parties perfected an appeal relative to decisions adverse to their interests concerning the above legal issues. Plaintiff additionally assigned as error the trial court's finding that Gulf Coast Aluminum was a purchaser under La.R.S. 47:301 and therefore directly liable for payment of a sales tax. We again turn to the written reasons for judgment of our learned brother below:
"The Court will initially address itself to plaintiffs' claim that payment by GCA to the State of $71,825 on August 25, 1970, represented a full and complete settlement and compromise in the amount agreed upon by both parties. Closely related to this argument are the contentions by plaintiffs that (1) the actions of the State's agents and employees in the compromise negotiations gave rise to a conventional and/or tacit remission of any debt due the State, and further (2) that the State is estopped from collecting the funds allegedly due because of said actions of its agents and employees."
"The sole witness for plaintiffs was William F. Boyer, Jr., who, during the construction of the plant, was employed by both GCA, as an executive vice-president, and by the Parish, as Project Supervisor for construction of the plant. Mr. Boyer *422 testified that the taxes were not paid because of the directive by Mr. Salter advising GCA not to pay them. He further explained that Mr. Salter later told him that a compromise settlement for $71,825 had been reached. He admitted that no representative of the Department ever told him that sales and use taxes were not due on the plant project."
"For the Collector, five employees of the Department, past and present, testified about their involvement in the matter. Levi A. Himes, a retired attorney for the Department with twenty years experience who had written the letter to Mr. Slater stating that the taxes had to be paid, declared that he was never contacted by Mr. Salter or GCA. He additionally said that Article 2-25 of the Department's Rules and Regulations subjecting parishes to imposition by the State of sales and use taxes was the policy of the Department in effect before and during the construction of the plant in question.[4] Sam Feinblum, retired director of the sales and use tax section for the Department, also with twenty years experience, attended two conferences with the plaintiffs about which he testified. He asserted that a settlement was never approved and that he did not know of anyone in the Department who ever told GCA that no sales and use taxes were due. On the contrary, he stated that at one of the conferences, at which he and Mr. Salter were present, among others, in reply to his question whether the $71,825 was payment in full, there was an answer in unison from those in attendance that it constituted part payment against any liability that might be due. Francis Lee, now Deputy Collector for consumer taxes for the Department, initiated field audit efforts to determine the amount of taxes due. He also attended conferences with petitioners, one of which was attended by Mr. Boyer. Mr. Lee asserted that he never indicated to petitioners that the State did not intend to collect sales and use taxes, but that he consistently told them that the full amount was due. He said the $71,825 was a payment on account pending determination of GCA's actual liability. Jim Puckett, a field auditor for the Department, took part in the Department's audit of GCA. He said that at no time did he ever tell GCA that sales and use taxes were not due. Finally, Wade J. Araby, the reviewing sales and use taxes auditor for the Department, with ten years experience, said that he always told plaintiffs that the taxes were due; and, following the payment of $71,825, that `more taxes' were due."
"From the above testimony, it is uncontroverted and evident that at no time did either the Collector or any representative or employee of the Department ever make any representations to petitioners that (1) sales and use taxes were not due on the construction of the plant; (2) the Collector did not intend to collect said taxes; (3) the payment on August 25, 1970, of $71,825 to the Collector by GCA was a full and complete settlement and compromise of petitioners' total liability for sales and use taxes arising out of the plant's construction. When this testimony is coupled with the fact that Article 2-25 of the Department's Rules and Regulations was operative during the whole of the period involved herein, said Article stating the policy of the Department to be one of requiring payment of the Louisiana Sales and Use Tax on purchases made by the State `or any parish, city, municipality, district or other political subdivision thereof,' or any `board, agency or instrumentality,' *423 it becomes the Court's inescapable conclusion that plaintiffs have failed to establish their claims so as to enable the Court to find that either a compromise settlement was consummated between the parties or that a conventional or tacit remission of any sales and use taxes due the State occurred. Plaintiffs have not borne their burden of proof by a preponderance of the evidence. In Franicevich v. Dumas, 150 So.2d 116 (La.App. 4th Cir. 1963), it was said:
"While remission need not be in writing and need not be in any particular form [LSA-Civil Code Art. 2199; Haley v. Badon [Badon], La.App. 98 So.2d 109; Noto Biasco v. [Blasco], La.App., 198 So. 429; Mouton v. Noble, 1 La.Ann. 192; See also Gremillion v. Dubea, La.App., 108 So.2d 288), the burden of proof is on the defendant. Gulf States Finance Corp. v. Moses, La.App., 56 So.2d 221; Thibodeaux v. W. Horace Williams Co., La.App., 14 So.2d 320. And the proof must be, at least, by a preponderance of the evidence. Doucet v. Dugas, La.App., 165 So. 754." 150 So.2d at 119-120.
"Meriting attention at this point is the insistence by petitioners that a payment by them to the Department which was credited by the Collector to taxes in Category 1 should have been allotted to Category 2. On August 25, 1970, GCA paid $71,825 to the Department. At the time payment was made there was no indication by either GCA or the Department as to which category the payment should be imputed. Thereafter, the Collector, unbeknownst to petitioners, credited the sum tendered to Category 1 use taxes. The basis of petitioners' opposition is staffed by the following articles of the Louisiana Civil Code:
"Art. 2163. The debtor of several debts has a right to declare, when he makes a payment, what debt he means to discharge."
"Art. 2165. When the debtor of several debts has accepted a receipt, by which the creditor has imputed what he has received to one of the debts specially, the debtor can no longer require the imputation to be made to a different debt, unless there have been fraud or surprise on the part of the creditor."
"Art. 2166. When the receipt bears no imputation, the payment must be imputed to the debt, which the debtor had at the time most interest in discharging, of those that are equally due; otherwise to the debt which has fallen due, though less burdensome than those which are not yet payable."
"If the debts be of a like nature, the imputation is made to the debt which has been longest due; if all things are equal, it is made proportionally."
Petitioners assert that Category 2 taxes are the most burdensome to them and represent the debt which they have the most interest in discharging. The Collector says the only indication that Category 2 taxes are more burdensome to petitioners than those in other categories is a 1972 opinion, adopted by the Parish, of the attorney for the Calcasieu Parish Police Jury that the contractractors could possibly be held directly liable for the taxes in Category 2.
"Imputation in LSA-C.C. Art. 2166 is made to the debt `. . . which the debtor had at the time most interest in discharging. . .'. No evidence was forthcoming from petitioners to show the relative status of the three categories of taxes in August of 1970 when the payment occurred. Further, the record is barren of any data, facts, testimony, exhibits or support of any kind to warrant the disposition petitioners desire. Absent reasonable grounds to hold otherwise, the Court finds the allocation by the Collector of the $71,825 payment to Category 1 was proper and, under the above circumstances, within the ambit of his general powers as set out in LSA-R.S. 47:1501 et seq."
"Petitioners' next contention is that any interest owed should be computed at a rate of 6%, rather than 12%, for all taxes *424 which became due prior to July 29, 1970, the effective date of the amendment to LSA-R.S. 47:1601 providing for interest on unpaid taxes. Amended in 1970 by Act No. 663, the statute now reads:
"Section 1601. Interest on unpaid taxes.
When any taxpayer fails to pay any tax, or any portion thereof, due under the provisions of this sub-title on or before the day when it shall be required by law to be paid, there shall be added to the amount of tax due, interest at the rate of one per centum per month from the due date until paid . . . Such interest shall be an obligation to be collected and accounted for in the same manner as if it were part of the tax due and can be enforced in a separate action or in the same action for collection of the tax, and shall not be waived or remitted."
"Before the amendment, an interest rate of 6% per annum was stipulated for. Retroactive application of the amendment will not be given effect by this Court and interest on all taxes which became due prior to July 29, 1970, will be calculated at 6% per annum, petitioners being entitled to a refund of all interest paid under protest in excess of such percentage plus interest on said sum at the rate of 2% per annum from the date said funds were received by the Collector of the date of refund, all as provided for in R.S. 47:1576. Generally, statutes should be construed to operate prospectively unless the words employed show a clear intent to have a retroactive effect. Long Leaf Lumber, Inc. v. Svolos, 258 So.2d 121 (La.App. 2nd Cir. 1972). An exception to the rule exists where the statute is remedial or procedural in nature. Hammond Asphalt Company, Inc. v. Joiner, 270 So.2d 244 (La.App. 1st Cir. 1972). In Long Leaf Lumber, there was a question as to whether the amendment to LSA-C.C. Art. 1938, raising the rate of legal interest from 5% to 7%, should be applied retroactively to a debt which matured prior to the effective date of the increase."
The Court therein held:
"Normally, statutes are given prospective application unless the contrary is clearly provided in the statute. Hearn v. Board of Trustees of Assessors' Retirement Fund, La.App., 204 So.2d 123 (2d Cir. 1967), writ refused, 251 La. 735, 206 So. 2d 90 (1968). The exception to the rule of prospective application is the remedial or procedural statute. A remedial statute is one which confers a remedy, and a remedy is the means employed to enforce a right or redress a wrong. Fullilove v. United States Casualty Co. of New York, La.App., 129 So.2d 816 (2d Cir. 1961). It is clear that the amendment of Article 1938 of the Civil Code created no remedy. This was a substantive change in the law, and should be given prospective application only." 258 So.2d at 124.
There is no language in Act 663 of 1970, increasing from 6% to 12% the rate of interest on unpaid taxes, which expresses legislative desire that R.S. 47:1601, as amended, be applied retroactively. Similar to C.C. Art. 1938, the instant statute is not remedial; it does not provide the means "to enforce a right or redress a wrong." Act 663 of 1970 effected a substantive change in the law and, accordingly, is subject only to prospective application.
"The next claim of petitioners relates to their position that the attorney for the Collector is not entitled to attorney fees under LSA-R.S. 47:1512. As aforementioned, the Collector is empowered to employ private counsel and, if any taxes, penalties or interest due the Department are referred to said attorney `for collection,' the tax debtor becomes liable for an additional 10% of the taxes, penalties and interest due as attorney fees."
"Allegations of equitable estoppel made by petitioners arise under the following set of facts:
1. On June 29, 1972, the Calcasieu Parish Police Jury authorized payment under protest of the sales taxes claimed due by the Department under Category 2.
*425 2. On June 30, 1972, payment under protest was tendered to the Collector in the amount of $360,952.59.
3. On July 19, 1972, this payment was returned to counsel for the Calcasieu Parish Police Jury. A letter accompanying the non-acceptance of the June 30th tender provided as follows:
"We have been instructed to advise you that the Collector would accept the $382,731.26 plus interest of $95,488.74 and $7,715.36 as penalty without the imposition of attorney's fees provided in R.S. 47:1512 providing your acceptance of these figures is immediately communicated to us and payment made within fifteen days."
4. A timely payment of the amount mentioned above was made to the Collector, and the Collector accepted this payment.
"The Collector's attorney argues that he is still entitled to the fee provided for in R.S. 47:1512 because his letter did not indicate that attorney fees wouldn't be imposed if the monies were paid under protest. He also says that he has had to defend a suit over said sum and that he is assisting the Collector in the `collection' of taxes due the Department."
"Inspection of the letter sent by the Collector's attorney reveals a clear intent by the Collector to remit any claim for attorney fees if the additional sum was forthcoming within a stipulated period of time. The sole disagreement expressed was with the amount paid by petitioners on June 30, 1972, not with the fact that payment had been made under protest. The letter only asked for an additional payment; this payment was made within the delay granted bringing the total paid under protest up to the aggregate demanded by the Collector."
"To arrive at the intent of the Legislature in enacting R.S. 47:1512, said statute must be construed in pari materia with R. S. 47:1576, the payment under protest article. Pertinent also is La.Const. Art. 10, Sec. 18, which provides:

"The Legislature shall provide against the issuance of process to restrain the collection of any tax and for a complete and adequate remedy for the prompt recovery by every taxpayer of any illegal tax paid by him." (Emphasis Added.)
From this constitutional mandate, R.S. 47:1576 came forth affording:
". . . a legal remedy and right of action . . . for a full and complete adjudication of any and all questions arising . . . as to the legality of any tax accrued or accruing or the method enforcement thereof."
Payment under protest was envisioned as a method by which a person could contest any assessment of taxes against him and have access to prompt recovery of any illegal tax paid by him."
"Herein, the Collector would have a taxpayer who pays under protest be adjudged liable for attorney fees the same as a recalcitrant taxpayer who refuses to pay in any manner whatsoever the taxes found due by the Collector, forcing the Collector to sue `for collection' of such assessments."
"In this case, certain sums have been paid under protest; it is argued by the Collector that they are not `paid' but only conditionally `paid under protest.' Perhaps, but when La.R.S. 47:1576 is comported with the purposes and policies inherent in La.R.S. 47:1576, it is a salutary conclusion that the wording `for collection' in La.R.S. 47:1512 equates the absence of a payment under protest."
"Buttressing such conclusion is the fact that the attorney fees provided for in La. R.S. 47:1512 are, as regards the pertinent taxpayer, an imposition of penalties. It has long been held by the Courts of this State that penalties in civil matters are not favored and should not be imposed except in cases which are clear and free from any *426 doubt. Madison v. Prudential Ins. Co. of America, 190 La. 103, 181 So. 871 (1938), Mitchell v. First National Life Insurance Company of Louisiana, 236 La. 696, 109 So.2d 61 (1959). It has further been recognized, in Quality Contractors Inc. v. State Licensing Board for Contractors, 206 So.2d 738 (La.App. 1st Cir. 1968), that:
". . . it is the law of this state that statutes imposing penalties must be strictly construed and all doubt must be resolved against the imposition of the penalty. Tichenor v. Tichenor, 190 La. 77, 181 So. 863 (1938)." 206 So.2d at 740.
"In light of the above discussed statutes, jurisprudence and reasoning thereon, the Court finds it unnecessary to rule on petitioners' plea of equitable estoppel, for the Court is of the opinion that R. S. 47:1512 imposes a penalty which should not be inflicted upon a taxpayer who has paid under protest. LSA-R.S. 47:1512 must be read together with R.S. 47:1576 and any doubt must be resolved in the tax debtor's favor. Attorney fees under R.S. 47:1512 will be denied the Collector's attorney."
"It must now be seen whether the sales tax statutes of Louisiana impose liability on GCA and the contractors. LSA-R.S. 47:304 directs that sales taxes be collected by the `dealer' from the `purchaser or consumer' and declares that `any dealer who neglects, fails or refuses to collect' said tax `shall be liable for and pay the tax himself.' Definitions of `Dealer' and `Purchaser' are to be found in LSA-R.S. 47:301(4), (9), in pertinent part as follows:"
"(4) `Dealer' includes every person who manufactures or produces tangible personal property for sale at retail, for use, or consumption, or distribution or for storage to be used or consumed in this state."
"`Dealer' is further defined to mean:
"* * * *
"(b) every person who sells at retail, or who offers for sale at retail, or who has in his possession for sale at retail, or for use, or consumption, or distribution, or storage to be used or consumed in this state, tangible personal property as defined herein;"
"(c) any person who has sold at retail, or used, or consumed, or distributed, or stored for use or consumption in this state, tangible personal property and who cannot prove that the tax levied by the Chapter has been paid on the sale at retail, the use, the consumption, the distribution, or the storage of said tangible personal property;"
"(d) any person who leases or rents tangible personal property for a consideration, permitting the use or possession of the said property without transferring title thereto;"
"(e) any person who is the lessee or rentee of tangible personal property and who pays to the owner of such property a consideration for the use or possession of such property without acquiring title thereto;"
"* * *
"(9) `Purchaser' means and includes any person who acquires or receives any tangible personal property, or the privilege of using any tangible personal property, or receives any services pursuant to a transaction subject to tax under this Chapter."
"It is important to remember the subject of this dispute, the taxable event occasioning the parties herein to become disputants: those Category 2 taxes resulting from the purchases made by the contractors in connection with their contracts for the construction of the plant. The Court is of the opinion that the contractors are `dealers' within the purview of R.S. 47:301, and, as such, are liable under R.S. 47:304 for failing to collect the taxes due on their contracts for the construction of the plant."
*427 "Petitioners allege that they cannot be held liable for interest and penalties because of their good faith throughout the construction of the plant. Proof of good faith, however, has not been forthcoming from petitioners. Moreover, the aforementioned letter of Mr. Himes, dated June 13, 1969, disputed Mr. Salter's position that no taxes were owing the State. Further, Article 2-25 of the Department's Rules and Regulations has been outstanding and in effect since 1961. Specifically, petitioners say that the penalty appertaining to the failure of Planet Corporation to file tax returns should not be imposed because said corporation was in good faith in believing that no taxes were due on the basis of Mr. Salter's letter so advising GCA and the contractors.[5] The penalty was assessed for failing to file a tax return. Planet was the only contractor that failed to file the requisite tax return; each of the numerous other contractors filed timely returns. Also, the letter from Mr. Salter does not by itself establish good faith because Mr. Salter was not a representative of the Department and no one in the Department ever advised Planet either that no taxes were due or that no return had to be timely filed. There being no showing of good faith on behalf of Planet Corporation, the penalty exacted against it, for failing to file a timely tax return, will stand."
"When any taxpayer fails to make and file any return required to be made under the provisions of this Subtitle at the time such return becomes due, there shall be imposed, in addition to any other penalties provided, a specific penalty to be added to the tax in the amount of five percent of the tax if the failure is for not more than thirty days, with an additional five percent for each additional thirty days or fraction thereof during which the failure continues, not to exceed twenty-five percent of the tax in the aggregate. This specific penalty shall be an obligation to be collected and accounted for in the same manner as if it were part of the tax due, and can be enforced either in a separate action or in the same action for the collection of the tax."
"Petitioners' assertion that GCA cannot be held liable for sales taxes since it is only a lessee and not a purchaser by any definition is rendered moot by its own admission that its lease agreement provides for payment inter alia of all taxes assessed against any equipment used in construction of the plant.[6]
For the above and foregoing reasons, we are of the opinion that those portions of the judgment of the District Court which have been appealed are correct, and accordingly are hereby affirmed.
NOTES
[1] The Louisiana Industrial Inducement Act emerged as Act 520 of 1964, codified as LSA-R.S. 39:991 et seq., and ratified by Article 14, Section 14(b.3) of the Louisiana Constitution of 1921.
[2] Payment of taxes under protest in Louisiana is governed by LSA-R.S. 47:1576 which states, in pertinent part:

"A right of action is hereby created to afford a remedy at law for any person aggrieved by the prohibition of courts restraining the collection of tax, penalty, interest or other charges imposed in this Sub-title. The person resisting the payment of any amount found due by the collector, or of enforcement of any provisions of this Sub-title, shall pay the amount found due to the collector and at that time shall give the collector notice of his intention to file suit for the recovery thereof. Upon receipt of this notice, the amount paid shall be segregated and held by the collector or his duly authorized representatives for a period of thirty days if suit is filed within the thirty-day period for the recovery of such amount, the funds segregated shall be further held pending the outcome of the suit. If the person prevails, the collector shall refund the amount to the claimant, with interest at the rate of 2% per annum covering the period from the date said funds were received by the collector to the date of refund.
"This Section shall afford a legal remedy and right of action in any state or federal court having jurisdiction of the parties and subject matter, for a full and complete adjudication of any and all questions arising in the enforcement of this Sub-title, as to the legality of any tax accrued or accruing or the method of enforcement thereof. In such action, service of process upon the collector shall be sufficient service, and he shall be the sole necessary and proper party defendant in any such suit.
[3] The power of the Collector to employ private counsel is found in LSA-R.S. 47:1512, viz:

"The collector is authorized to employ private counsel to assist in the collection of any taxes, penalties or interest due under this Sub-title, or to represent him in any proceeding under this Sub-title. If any taxes, penalties or interest due under this title are referred to an attorney at law for collection, an additional charge for attorney fees, in the amount of ten per centum (10%) of the taxes, penalties and interest due, shall be paid by the tax debtor."
[4] Article 2-25 of the Rules and Regulations of the Department was promulgated in connection with the Louisiana Sales Tax statutes, LSA-R.S. 47:301 et seq., being issued by the Collector on May 1, 1961, having been in full force and effect since that date as follows:

"Article 2-25. Sales to the State and Political Subdivisions.
Sales of tangible personal property to this State or any parish, city, municipality, thereof, or to any board, agency or instrumentality, are subject to the tax imposed by this Act."
[5] The pertinent statute imposing a penalty for failure to make a timely return is LSA-R.S. 47:1602, as follows:

Section 1602. Penalty for failure to make timely return.
[6] Section 6.3 of the lease agreement between GCA and the Parish provides for GCA's contractual responsibility for payment of any taxes on the plant project other than those classed as ad valorem or on income or profits of the Parish from said project:

"Section 6.3 Taxes, Other Governmental Charges and Utility Charges. The Parish and the Lessee acknowledge (i) that under present law no part of the Project owned by the Parish will be subject to ad valorem taxation by Louisiana or by any political or taxing subdivision thereof, and that under present law the income and profits (if any) of the Parish from the Project are not subject to either Federal or Louisiana taxation, and (ii) that these factors, among others, have induced the Lessee to enter into this agreement. However, the Lessee will pay, as the same respectively become due, all taxes and governmental charges of any kind whatsoever that may at any time be lawfully assessed or levied against or with respect to the Project or any machinery, equipment or other property installed or brought by the Lessee therein or thereon, all utility and other charges incurred in the operation, maintenance, use, occupancy, and upkeep of the Project and all assessments and charges lawfully made by any governmental body for public improvements that may be secured by lien on the Project." (Emphasis Added.)