O’NIELL, C. J.
 

 This is an action to abate the levying of taxes on a quantity of oil in a storage tank, at St. Rose, in the parish of St. Charles, Da. The taxes complained of are the ad valorem taxes levied by the state and the parish, generally, on all property subject to such taxation. There is no charge of discrimination against the property of the defendant in that respect. The property assessed was a quantity of oil belonging to the plaintiff, in storage tanks belonging to the Petroleum Import & Export Corporation, near the Mississippi river, being the estimated average qiiantity of oil on hand, and was assessed at $200,000. It was not charged in the plaintiff’s petition that the estimate of either the quantity or the value of the oil assessed was excessive. The only complaint was that the taxing of the oil was deemed an interference with interstate and foreign commerce, and therefore violative of the third clause of ithe eighth section and the fifth clause of the ninth section and the second clause of the tenth section of article 1 of the Constitution of the United States. The district court gave judgment in favor of the plaintiff, annulling the assessment and abating the tax, on the ground that the oil which was assessed was in transit, or on its way, from another state to a foreign country, and was halted only temporarily at St. Rose, and had not a situs in the parish of St. Charles or state of Louisiana. The defendants, who are the tax collector, the assessor, and the Louisiana Tax Commission, have appealed from the decision.
 

 There is no dispute about the facts of the ease, so far as they are pertinent to the question at issue. The plaintiff, Carson Petroleum Company, is a Delaware corporation, engaged in buying and selling oils, and particularly in exporting the same. The Petroleum Import & Export Corporation is a subsidiary of the Carson Petroleum Company, and owns and operates the system of tanks and pumping equipment for receiving the contents of the railroad tank cars of oil into the tanks owned by the Petroleum Import & Export Corporation and afterwards loading it into ships for export. The Port of New Orleans has no. facility or equipment for assembling or receiving from railroad tank cars cargoes of oil and loading it aboard ships for export. The tanks and equipment at St. Rose, a few miles above New Orleans, were constructed for that purpose. No oil is sold at St. Rose except What is exported. The only business conducted there is the unloading of oil from railroad tank cars into the storage tanks and the loading of the oil from the storage tanks
 
 *381
 
 aboard the tankers for shipment to England, France, and other foreign ports. The oil is bought by the Oarson Petroleum Company from the refiners in the Mid-Continent Field, comprising Kansas, Oklahoma and Texas, and is shipped to St. Rose, La., in railroad tank cars consigned to the Carson Petroleum Company. The shipments are not on through bills of lading, but on an export rate, which is lower than the domestic rate. The oil is a higher grade of gasoline than is used in this country generally, and is made especially for export, because the automobiles in Ehgland, France and other foreign countries require a higher grade of gasoline than that which is used in this country. The Carson Petroleum Company takes orders for cargoes of oil from the foreign buyers, who charter the vessels to transport the oil from St. Rose to the foreign ports. The company always has orders on hand in excess of the quantity of oil at St. Rose, and buys the oil in the Mid-Continent Field for the purpose of filling orders already received from the foreign buyers. The oil in each railroad tank car, however, is not segregated or assigned or destined to any particular cargo or shipment abroad, but is pumped into the lar-ge storage tanks, having the capacity of many tank cars, and is held in the tanks until a ship arrives, or until a sufficient quantity of oil is accumulated to make up a cargo. A ship carries from two to three million gallons; hence it takes 300 to 500 railroad tank ears, or 10 to 16 - trains of tank ears, to make up a cargo of oil. The buyers are allowed a 10 per cent, leeway on the quantity of oil bought for each shipment; which, as we understand, means that, if the capacity of the ship is either more or less than the quantity of oil contracted for, the buyer can demand a delivery of the ship’s capacity, at the contract price of the oil per gallon, provided the quantity'shall be not more than 10 per cent, above or below the quantity contracted for. A delivery of the oil thus sold is made by loading the oil aboard the ship chartered by the buyer. Until the oil is thus loaded aboard a ship it belongs to the Oarson Petroleum Company and is insured in the name of the company, loss payable to the company. There are times when an accumulation of oil in the tanks is awaiting the arrival of a ship, and at other times a ship is awaiting, the accumulation of a sufficient quantity of oil to make up a cargo. In order to save demurrage on ships, which amounts to $1,500 or $2,000 per day on a ship, the Oarson Company endeavors to have a sufficient quantity of oil on hand at St. Rose to fill each order promptly on arrival of the ship. On account of the' demurrage charges on tank cars, as well as on steamships, it would be impracticable to carry on the export oil business by any other method than by storing the oil in large storage tanks as the train loads of oil arrive, and shipping from the accumulation when the ships arrive. The oil is shipped from the storage tanks in the same condition in which it was received from the tank cars, without being treated in any way. The oil is never kept on hand at St. Rose any longer than is necessary. The quantity on hand is always awaiting either the arrival of a ship or the accumulation of a sufficient quantity to load a ‘ship.
 

 The plaintiff, appellee, contends that the interstate and foreign shipment of the oil, from the refineries in the Mid-Continent Field, into and across the state of Louisiana, and across the sea to the foreign ports, is a continuous interstate and foreign shipment, notwithstanding the stoppage and storage of the oil at St. Rose, where it has to await either the arrival of a ship or the accumulation of a sufficient quantity of oil to load a ship. The defendants, appellants, contend that there are two separate shipments of the oil- — -the interstate shipment, which ends when the tank cars arrive and are unloaded at St. Rose, and the foreign shipment, which begins when the
 
 *383
 
 oil is loaded aboard a ship destined for a foreign port. Hence the defendants, appellants, contend that, while the oil is stored in the tanks at St. Rose, under the protection of the state and local government, it is subject to state and local taxation, notwithstanding it is intended and prepared for exportation.
 

 The interstate and foreign commerce clause of the Federal Constitution does not exempt movable property from state or local taxation, if it is not discriminative, unless the property is in actual transit in interstate or foreign commerce; and the question of continuity of transit which will exempt property moving in interstate or foreign commerce, from state or local taxation, is to be determined by the various factors in the situation, among which are the intention of the owner, the control which he retains to change the destination, the agency or agencies by which the transit is affected, and the cause or occasion or purpose of the interruption during which the property is assessed for state or local taxation. Champlain Realty Co. v. Brattleboro, 260 U. S. 366, 43 S. Ct. 146, 67 L. Ed. 309, 25 A. L. R. 1195.
 

 The mere intention of the owner to export the property, even when coupled with a preliminary shipment in preparation for exportation, does not constitute the beginning of an interstate or foreign shipment. To exempt the property from state or local taxation, it must have been shipped, or entered with a carrier for shipment, to another state or a foreign country, or started on a continuous route or journey beyond the state. Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715; Diamond Match Co. v. Ontonagon, 188 U. S. 82, 23 S. Ct. 266, 47 L. Ed. 394; General Oil Co. v. Crain, 209 U. S. 211, 28 S. Ct. 475, 52 L. Ed. 754; Bacon v. Illinois, 227 U. S. 504, 33 S. Ct. 299, 57 L. Ed. 615; Champlain Realty Co. v. Brattleboro, 260 U. S. 366, 43 S. Ct. 146, 67 L. Ed. 309, 25 A. L. R. 1195; Rees-Scott Co. v. City of New Orleans, 124 La. 155,
 
 49 So.
 
 1012.
 

 It is not possible to distinguish this case from General Oil Co. v. Crain, supra, in the application of the law to the facts of the case. The General Oil Company was a Tennessee corporation, having its principal place of business in Memphis, and engaged in the business of manufacturing illuminating oils and selling them in other states into which they were shipped. The company’s wells and refining plants were in Pennsylvania and Ohio, from which the oils were shipped into the states in which they were sold and used. On account of the tendency of the oils to leak and evaporate and to burst the containers in changes of temperature, it was necessary to ship the oils in railroad tank cars, to the several distributing points throughout the United States, at which the oil was put into barrels or other smaller containers suitable in size for filling orders, which varied in amounts from one barrel upward. It was impracticable to maintain an equipment for the reception and distribution of the oil at eveiw such point at which orders were filled. Memphis was one of such distributing points, to which the oils were shipped from Pennsylvania and Ohio in tank cars, and at which the oils were unloaded into tanks and put into barrels and other smaller vessels and forwarded to the company’s customers in Arkansas, Louisiana, and Mississippi, in which states the company had many regular customers, from whom it always had on hand unfilled orders for oil, to be delivered as soon as possible or convenient. The company conducted also a local business, selling and delivering oil to customers in Memphis, and maintained large tanks, of various sizes, for the several kinds of oils, to be put into barrels dr other smaller vessels, to be sold locally or to fill the orders already received from the customers in Arkansas, Louisiana, and Mississippi. For many years the company unloaded its oil from its tank ears into the large stationary tanks without attempting to segregate the oil which was sold or intended to be sold locally from that
 
 *385
 
 which was to be forwarded to the customers in Arkansas, Louisiana, and Mississippi; and the company paid an inspection fee or tax of 25 cents per barrel, levied by a statute of Tennessee, on all of the oils in the company’s stationary tanks in Memphis, whether the oil was intended for sale in Tennessee or in the other states mentioned. Being advised that the oil destined to be shipped and sold outside of the state of Tennessee would not be subject to the local inspection tax if kept separate from the oil sold or intended to be sold in Tennessee, the company inaugurated and maintained a system of segregating the oil that was to be shipped to the customers in Arkansas, Louisiana, and Mississippi, from that which was sold or intended to be sold in Tennessee. A stationary tank, marked plainly and conspicuously, “Oil Already Sold in Arkansas, Louisiana, and Mississippi,” was maintained, in which alone was kept the oil for which orders ha,d been received from the customers in those states before the oil was shipped from the plants in Pennsylvania and Ohio especially to fill such orders. That oil was unloaded from the tank cars at Memphis into the stationary tank only for the purpose of putting it into the smaller vessels to meet the requirements of the orders which had been received from the customers in Arkansas, Louisiana, and Mississippi, before the oil was shipped from Pennsylvania or Ohio, and was kept separately, in the tank marked, “Oil Already Sold in Arkansas, Louisiana, and Mississippi,” until put into the smaller vessels and forwarded to the customers in those states. ■ Another stationary tank, mark* ed plainly and conspicuously, “Oil to be Sold in Arkansas, Louisiana, and Mississippi,” was maintained, in which the oil to be sold in those states, but for which there were no orders received before the oil was shipped in the tank cars from the company’s plants in Pennsylvania and Ohio, was kept separate and apart from all other oil until required for fiUing orders from the company’s customers in those states, and was never sold except on receipt of such orders. Thereafter, the company invoked the commerce clause of the Constitution of the United States, contending that in so far as the inspection fee or tax was sought to be imposed upon the oil in the two tanks marked as we have said it was violative of the third clause of the eighth section of article 1 of the Constitution, giving the Congress the exclusive power to regulate commerce among the several states. The defendant filed a demurrer, attacking the jurisdiction of the court on the ground that the suit was one against the state or against an officer acting by authority of the state. The chancery court overruled the demurrer in so far as the oil in the tank marked “Oil Already Sold in Arkansas, Louisiana, and Mississippi” was concerned, and sustained it in so far as the oil in the tank marked “Oil to be Sold in Arkansas, Louisiana, and Mississippi” was concerned. On appeal, the Supreme Court of Tennessee (117 Tenn. 82, 95 S. W. 824, 121 Am. St. Rep. 967) decided that the suit was one against the state, and reversed the decree of the chancery court. The plaintiff sued out a writ of error, and the Supreme Court of the United States affirmed the judgment on the ground that “no constitutional right of the oil company was violated by the enforcement of the law” levying the tax. In the course of the opinion, Mr. Justice McKenna, for the court, after reviewing many like cases, including Coe v. Errol, supra, and Diamond Match Co. v. Ontonagon, supra, said:
 

 “Like comment is applicable to plaintiff in error and its oil. The company was doing business in the state, and its property was receiving the protection of the state. Its oil was Hot in movement through the state. It had reached the destination of its first shipment, and it was held there, not in necessary delay or accommodation to the means of transportation, as in State [Detnold, Prosecutor] v. Engle, supra, but for the business purposes and profit of the company. It was only there for distribution, it is said, to fulfill orders already received. But
 
 *387
 
 to do this required that the property be given a locality in the state beyond a mere halting in
 
 its
 
 transportation. It required storage there— the maintenance of the means of storage', of putting it in and taking it from storage. The bill takes pains to allege this. ‘Complainant shows that it is impossible, in the coal oil business, such as complainant carries on, to fill separately each of these small orders directly from the railroad tank cars, because of the great delay and expense in the way of freight charges incident to such a plan, and for the further rea'son that an extensive plant and apparatus is necessary in order to properly and conveniently unload and receive the oil from said tank cars, and it would be impracticable, if not impossible, to have such apparatus and machinery at every point to which complainant ships said oil.’
 

 “This certainly describes a business — describes a purpose for which the oil is taken from transportation, brought to rest in the state and for which the protection of thfe state is necessary, a purpose outside of the mere transportation of the oil. The case, therefore, comes under the principle announced in American Steel & Wire Co. v. Speed, 192 U. S. 500 [48 L. Ed. 538, 24 Sup. Ct. Rep. 365].
 

 “We have considered this case so far in view of the cases which involve the power of taxation. It may be t]iat such power is more limited than the power to enact inspection laws. * * * The'difference, if any exists, it is not necessary to observe. The cases based on the taxing power show the contentions of plaintiff in error are without merit; in other words, show that
 
 its
 
 oil was not property in interstate commerce.”
 

 The court considered and rejected, in the case just cited, every contention made in the argument of the oil company in the present case, to the effect that the unloading and stor-. ing of the oil in the stationary tanks was merely a necessary incident of the .business and an unavoidable delay in the transportation of the oil beyond the state.
 

 As to the method of assessing and taxing mováble property that is temporarily halted and at rest, between its transportation within and its exportation from the state, it was said in Coe v. Errol, supra:
 

 “But granting all this, it may still be pertinently asked: How can property thus situated, to wit, deposited or stored at the place of entrepot for future exportation, be taxed in the regular way as part of the property of the state? The answer is plain. It can be taxed as all other property is taxed, in the place where it is found, if taxed or assessed for taxation, in the usual manner in which such property is taxed; and not singled out to be assessed by itself in an unusual and exceptional manner because of its destination. If thus taxed, in the usual way that other similar property is taxed, and at the same rate, and subject to like conditions and regulations, the tax is valid. In other words, the right to tax' the property being founded on the hypothesis that it is still a part of the general mass of property in the state, it must be treated in all respects as other property of the same kind is treated.
 

 “These conditions we understand to have been complied with in the present case. At all events there is no evidence to show that the taxes were not imposed in the regular and ordinary way. As the presumption, so far as mode and manner are concerned, is always in favor of, and not against, official acts, the want of evidence to the contrary must be regarded as evidence in favor of the regularity of the assessment in this case.”
 

 The oil company, as appellee in this case, relies mainly upon the definitions given in cases involving, not the question of the right of a state to tax property claimed to be moving in interstate or foreign commerce, but the question as to whether the commerce itself— when claimed to be interstate or foreign commerce — is subject to state regulation or subject to federal regulation. We refer particularly
 
 to
 
 Swift & Co. v. United States, 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518, Texas & New Orleans Railroad Co. v. Sabine Tram Co., 227 U. S. 111, 33 S. Ct. 229, 57 L. Ed. 442, and Railroad Commission of Louisiana v. Texas & Pacific Railway Co., 229 U. S. 336, 33 S. Ct. 837, 57 L. Ed. 1215. The Supreme Court of the United States in defining “exports” and in determining when a shipment is in interstate or foreign commerce, has recognized or at least has intimated that the limitation on the power of the states to tax property when halt-, ed in an interstate or foreign shipment is not so strict as is the prohibition against any in-.
 
 *389
 
 terference with the exclusive power of the Congress to regulate the interstate and foreign commerce itself. For example, in Swift & Co. v. United States, 196 U. S. 400, 25 S. Ct. 281, 49 L. Ed. 526, it is said:
 

 “But we do not mean to imply that the rule which marks the point at which state taxation or regulation becomes permissible necessarily is beyond the scope of interference by Congress in cases where such interference is deemed necessary for the protection of commerce among the states. Nor do we mean to intimate that the statute under consideration is limited to that point. Beyond what we have said above, we leave those questions as we find them. They were touched upon in Northern Securities Co. v. United States, 193 U. S. 197 [48 L. Ed. 679. 24 S. Ct. R. 436].”
 

 Accordingly, if the state were attempting, in this instance, to regulate, or to impose a burden, such as a license tax, upon the business itself which is being conducted by the Carson Petroleum Company or by the Petroleum Import & Export Corporation, at St. Rose, the case would present a different question, to which the rulings cited by counsel for the Carson Petroleum Company would be apropos.
 

 According to the rulings in Coe v. Errol, Diamond Match Co. v. Ontonagon, General Oil Co. v. Crain, and Bacon v. Illinois, supra, as distinguished from and approved in Champlain Realty Co. v. Brattleboro, supra, the judgment appealed from must be reversed, and the demand of the plaintiff rejected and its suit dismissed.
 

 The tax collector claims his attorney’s fee of 10 per cent, upon the aggregate amount of the taxes and penalties to be collected, for defending this suit in which the tax collector is sought to'be restrained from collecting the tax. The claim is well founded. Act 170 of 1898, § 56, p. 373; Globe Lumber Co. v. Clement, 110 La. 438, 34 So. 595.
 

 The judgment appealed from is annulled; the writ of injunction which was issued herein is dissolved; the plaintiff’s demand is rejected and its suit is dismissed at its cost; and it is ordered, adjudged and decreed that the tax collector shall collect from the plaintiff, Carson Petroleum Company, as part of the costs hereof, the tax collector’s attorney’s fee of 10 per cent, on the aggregate amount of the taxes which he was sought to be restrained from collecting, and the penalties imposed by law.