367 So.2d 1143 (1978)
SOUTH CENTRAL BELL TELEPHONE COMPANY
v.
Joseph N. TRAIGLE, Collector of Revenue, State of Louisiana.
No. 62011.
Supreme Court of Louisiana.
December 15, 1978.
Rehearing Denied March 16, 1979.
Robert G. Pugh, Shreveport, for defendant-applicant.
Rexford L. Hawkins, Louisville, Ky., J. Robert Fitzgerald, New York City, Victor A. Sachse, Jr., Baton Rouge, for South Central Bell Tel. Co.
DIXON, Justice.
This is a suit to recover transportation and communication utilities taxes paid under protest by South Central Bell Telephone Company. We granted writs on the Collector's application when the Court of Appeal reversed the district court's judgment in favor of the Collector. 357 So.2d 610 (La. App. 1st Cir. 1978).
R.S. 47:1001 et seq.[1] levies a tax based on gross receipts of certain utilities. The Collector *1144 contends that funds received from advertising in telephone directories should be included in the gross receipts on which the tax is computed. The Company contends that advertising is not a public utility, and funds received from sources other than utility revenue are not covered by the taxing statute.
The first section of the statute (§ 1001) levies, in addition to other taxes, a 2% tax on gross receipts "from its intrastate business" on every owner or operator of a public utility, as defined later in the Part. Section 1002 characterizes the tax as a license tax for the privilege of engaging in a public utility, limited to business not a part of interstate commerce. The third section of the Part contains definitions: (1) defines public utility to include telephone companies; (7) defines telephone companies as those who transmit messages for speech or sound, and are engaged "in the business of furnishing telephone service for compensation;" (11) defines "gross receipts" to mean "the total amount of billings for services rendered, and all receipts from business beginning and ending within the state" except for certain transportation industries. Section 1004 makes the Part applicable to any person engaged in any business, any part of which is included in the various classes of business defined in § 1003, but only on receipts derived from that portion of the business included in § 1003.
In 1950 the Louisiana Public Service Commission issued a special order requiring that a telephone directory be published and distributed to subscribers.[2] The Company now derives receipts from advertising in both white pages and yellow pages of the *1145 directories (ranging in Louisiana from over $11,000,000 in 1969 to over $18,000,000 in 1975).
At this point, then, it seems clear that the telephone company is a telephone company, that publishing a directory is part of its business covered by the third section, and that revenues from advertising in the directories are to be included in "gross receipts" and taxed.
The Court of Appeal emphasized that advertising is not a public utility, that § 1004 recognized that a public utility company can be engaged in utility and non-utility businesses at the same time, and that only public utility receipts are subject to the tax. Its emphasis is misplaced. The statute emphasized, in § 1001, that the tax is levied on the gross receipts of the intrastate business of the utility. "Gross receipts" means, according to § 1003(11), "the total amount of billings for services rendered, and all receipts from business beginning and ending within the state . . ." It is true that § 1004 recognizes that a person may be engaged in different kinds of business, and that the section limits the tax so that it is to be levied "only upon the gross receipts derived from that portion of the business" covered by § 1003. We cannot say that receipts from advertising in a directory required by the Public Service Commission to be published each year are not "receipts derived from" the telephone business.
The strongest argument of the Company is that the early legislation (Act 26 of the Third Extra Session of 1934 and Act 26 of the Second Extra Session of 1935) contained, in a definition of "gross receipts," the words "whether same be from the actual operation of such business or from a source incidental to such business" and this phrase was removed by an amendment in Act 116 of the Regular Session of 1940. The Company argues that since advertising is not a utility, and is a different kind of business from communication by wire, the advertising revenues are "from a source incidental" to the telephone business; even if directory advertising might have fallen within "gross receipts" before 1940, the Company argues that the 1940 amendment had the effect of limiting "gross receipts" to receipts from telephone service, and not receipts from advertising, which was only incidental to the telephone business.
The advertising revenues here involved are not receipts "from a source incidental to such business." In the "actual operation" of the "business of furnishing telephone service for compensation," the Company is required to distribute to subscribers annual directories, in which the Company prints advertising by its subscribers. True, the Company is not required to carry advertising; but when it does, the income from the advertising is a direct and immediate result of the phone company's business, and not merely a "source incidental" to that business. It is part of the communications among the subscribers of the Company.
The directory is not a separate enterprise of the Company, nor is the advertising contained in the directory, nor the promotion of the advertising. Not only does the directory advertising pay for the directory the Company is required to publish; not only does it turn a profit; it is a direct and immediate promotion of the Company's commoditythe use of the telephone. "Let your fingers do the walking" is almost an American idiom because of the Company's intensive promotiondesigned not merely to sell advertising, but to sell telephone service. As the trial judge found:
"It would tax one's imagination to hold that revenues derived from directory classified advertising constitute revenues derived from a separate enterprise outside the scope of South Central Bell's business of `furnishing telephone service for compensation.'"
The Collector asserts in brief, and South Central Bell does not forcefully dispute, that by their own records: South Central makes no distinction between white pages and yellow pages for (a) personnel costs; (b) sales promotion costs; (c) delivery and storage of directories; (d) general overhead expense; (e) directory assistance records; and (f) bold-face listings in white pages as *1146 against yellow pages, as it relates to revenues. In the production of the directory, as between white and yellow pages, South Central has: no separate staff; no separate building; no separate budget; no separate company; and no separate personnel.
We find no indication that the effect of Act 116 of 1940, when it amended the definition of "gross receipts," was to narrow the definition as the Company claimed. The 1940 amendment represented an abandonment of the effort (in the 1934 and 1935 acts) to tax utilities on receipts from business moving through Louisiana.[3] All references to "the proportion of the mileage within this State" were removed. The old § 2 was replaced with the cleansing precursor of 47:1002, expressing the object of the tax to be a tax on the privilege of operating a utility in Louisiana, with no relation to interstate commerce. The failure of the 1940 act to repeat, in the definition of "gross receipts," the phrase "whether . . . from the actual operation . . . or from a source incidental to such business" appears to be a removal of a redundant phrase, because, as amended, "[T]he words `gross receipts' shall mean the total amount of billings for services rendered, and shall include all receipts from business beginning and ending within this State." (Act 116 of 1940 amending § 5 of Act 26 of the Third Extra Session of 1934; the same section changed the dates for reporting). The resulting definition of "gross receipts," including "all receipts from business" in the State is very broad.[4]
We conclude, therefore, that funds received from advertising in telephone directories should be included in the gross receipts on which the tax is computed.
The Collector contends that the trial court erred when it refused to award attorney fees to the Collector pursuant to R.S. 47:1512.[5] The Company argues that consistent with two recent Court of Appeal cases, infra, the Company should not be *1147 liable for 10% attorney fees when it pays under protest pursuant to R.S. 47:1576.[6]
The statutory development of the procedure for paying taxes under protest, and then litigating the legality of the tax or assessment, took several years. Article 10, § 18 of the Constitution of 1921, to avoid the disruptive practice of enjoining the collection of contested taxes, stated that the legislature should "provide against the issuance of process to restrain the collection of any tax and for a complete and adequate remedy for the prompt recovery by every tax payer of any illegal tax paid by him." In 1927, in a suit to enjoin a paving project, this court held that Art. 10, § 18 was not self-operative, and that the legislature had not passed statutes to make it effective. Taylor v. City of Hammond, 163 La. 1097, 113 So. 573 (1927).
Act 16 of [the Second Extra Session of] 1934 was apparently the first legislation attempting to comply with Art. 10, § 18 of the 1921 Constitution. It contained three sections, the first prohibiting courts from restraining collection of any tax (the preceding act having given the collector or taxing body the right of suspensive appeal from any injunction previously issued in pending tax litigation) and the second section providing for the "reimbursement" of any tax paid and then "declared illegal by any court of competent jurisdiction . ." The third section declared that it did not repeal any law "providing that the tax payers shall have the right of testing the correctness of their assessments before the courts of the State" unless it was in conflict with Act 16.
In 1937 a federal district court enjoined the collection of a gasoline tax ". . . because Act No. 16 of the Second Extra Session of . . . 1935, does not provide an adequate remedy at law for the recovery of the tax, if paid under protest." Texas Co. v. Wilkinson, 21 F.Supp. 771 (E.D.La. 1937). Act 330 of 1938 followed, enacting the procedure for paying under protest and suing for refund of taxes claimed to be illegal. The act of 1938 shaped substantially the payment-under-protest provisions as they appear in R.S. 47:1576 and 47:2110.
In the half century since establishing payment-under-protest as a remedy for taxpayers to test the legality of a tax, this court has not decided whether the losing taxpayer must also pay attorney fees for the collector. However, in the days before payment-under-protest, when the legality of taxes was customarily tested by injunction, the losing taxpayer always paid attorney fees for the collector. As early as 1890 with § 56 of Act 106 and again in 1898 with § 56 of Act 170, the legislature provided that the attorney who represented the tax collector defending injunction proceedings "shall receive" a compensation of 10% of *1148 the amount collected.[7] When interpreting these statutes, this court has always required the taxpayer to pay 10% on the amount collected to the attorney who represented the tax collector in successfully defending the taxpayer's injunction suit. See, United Ry. & Trading Co. v. Mevers, Sheriff, 112 La. 897, 36 So. 797 (1904); Tulane University of La. v. Board of Assessors, 115 La. 1025, 40 So. 445 (1906); Howcott v. Smart, Tax Collector, 125 La. 50, 51 So. 64 (1910); Texas & P. Ry. Co. v. Flournoy, Sheriff, 128 La. 71, 54 So. 475 (1911); Dorcheat Valley R. R. v. Clement, Tax Collector, 137 La. 520, 68 So. 857 (1915); Industrial Lumber Co. v. Oden, Tax Collector, 147 La. 751, 85 So. 901 (1920); J. H. Hines Co. v. Guillot, Sheriff, 153 La. 319, 95 So. 794 (1923), error dismissed 266 U.S. 581, 45 S.Ct. 89, 69 L.Ed. 452; Carson Petroleum Co. v. Vial, Sheriff, 166 La. 378, 117 So. 432 (1928), appeal and error dismissed 278 U.S. 560, 49 S.Ct. 24, 73 L.Ed. 505, cert. granted 278 U.S. 595, 49 S.Ct. 81, 73 L.Ed. 526, judgment reversed on other grounds, 279 U.S. 95, 49 S.Ct. 292, 73 L.Ed. 626. See also, Gulf Refining Co. of La. v. Phillips, Tax Collector, 11 F.2d 967 (5 CA 1926).
Further, the taxpayer has always been exposed to the imposition of attorney fees for the collector when he sued to reduce or cancel an assessment, and lost. See, Morgan's Louisiana & T. R. & C. C. Co. v. Pecot, Sheriff, 50 La.Ann. 737, 23 So. 948 (1898); Bonner v. Board of Assessors, 52 La.Ann. 2062, 28 So. 369 (1900); State ex rel. Stempel v. City of New Orleans, 105 La. 768, 30 So. 97 (1901); Methodist Episcopal Church, South v. City of New Orleans, 107 La. 611, 32 So. 101 (1902); Globe Lumber Co. v. Clement, Assessor, 110 La. 438, 34 So. 595 (1903); Sibley, L. B. & S. Ry. Co. v. Currie, Tax Collector, 137 La. 713, 69 So. 148 (1915); Palmer Co. v. Police Jury of Red River Parish, 142 La. 1076, 78 So. 122 (1918); Hayne v. Assessor, 143 La. 697, 79 So. 280 (1917); Soniat v. Board of State Affairs, 146 La. 450, 83 So. 760 (1919); Baton Rouge Waterworks Co. v. Board of State Affairs, 149 La. 391, 89 So. 247 (1921); Mortgage & Securities Co. v. City of New Orleans, 153 La. 1073, 97 So. 44 (1922); Crowell & Spencer Lumber Co. v. Police Jury of Natchitoches Parish, 164 La. 971, 115 So. 51 (1927); Gulf Public Service Co. v. La. Tax Commission, 9 La.App. 405, 119 So. 464 (1928); Opelousas-St. Landry Bank & Trust Co. v. Thibodaux, Tax Collector, 169 La. 1194, 126 So. 919 (1930); Frost Lumber Industries v. Pickel, Assessor, 181 La. 180, 159 So. 316 (1935). See also, Daspit v. Sinclair Refining Co., 198 La. 9, 3 So.2d 259 (1941).
When part of the tax assessed was admittedly due, the attorney fee was sometimes computed on the contested portion, when found by the court to be properly assessed. Sibley, L. B. & S. Ry. Co. v. Currie, supra; Crowell & Spencer Lumber Co. v. Police Jury of Natchitoches Parish, supra; Tremont Lumber Co. v. May, Assessor, 143 La. 389, 78 So. 650 (1918) and Louisiana Central Lumber Co. v. May, Assessor, 143 La. 420, 78 So. 660 (1918). (In the case before us, the Company contests the entire amount of the tax paid under protest).
The Company argues that, since R.S. 47:1512 provides that attorney fees are due "If any taxes . . . are referred to an attorney at law for collection . . ." no attorney fees are due because the tax was not "referred to an attorney for collection," the taxes having been paid under protest.
*1149 A similar argument was made long ago. In Liquidating Commissioners of New Orleans Warehouse Co. v. Marrero, Tax Collector, 106 La. 130, 30 So. 305 (1901), the plaintiffs-taxpayers tendered to the tax collector the amount of taxes that the taxpayers acknowledged as due. When the tax collector declined the payment, the taxpayers deposited the uncontested amount with the court. The plaintiffs then sued to enjoin the sale of their property for taxes when the tax collector advertised the property for sale to enforce payment for the unpaid taxes. After temporarily staying the sale, the trial court set aside the injunction and directed the tax collector to proceed. On appeal, the taxpayers argued that if they were judged liable for the additional amount then they should not be "mulcted" for the penalty of 2% per month and 10% commission as attorney fees on the amount deposited because the penalty and 10% commission should be limited to the balance due. This court found:
"Nevertheless a majority of the court think, under all the circumstances of the case, plaintiffs should be relieved of the two per cent. per month interest on the amount they deposited in court, from and after the date of its deposit,this upon the theory that, following the deposit, the tax collector could at once have obtained from the court an order for the delivery to him of the amount deposited as so much admitted to be due. But, as far as the commissions due the tax collector's attorney are concerned, they must be paid on the full amount to be collected, including the amount deposited, for the reason that the same is compensation earned by him for successfully defending an injunction suit brought by plaintiffs to prevent the sale of their property in enforcement of the taxes due thereon." 106 La. 130, 138-9, 30 So. 305, 309.
Another case decided in 1901 involved attorney fees under § 56 of Act 170 of 1898, which provided for 10% attorney fees "in all proceedings for the reduction of assessments and collection of taxes (license taxes excepted), and in all injunction proceedings wherein the tax collector or tax collectors are sought to be restrained from the collection of taxes . . ." The taxpayer brought a mandamus action to cancel the assessment for 1897, claiming the assessment had been untimely made. This court ruled adversely to the taxpayer, who then opposed paying the attorney fees because the suit was neither for the reduction of an assessment, collection of a tax, nor an injunction. The court concluded that mandamus was like an injunction, and "There is as much necessity for services of counsel as there is in defending an injunction." State ex rel. Stempel v. City of New Orleans, 105 La. 768, 772, 30 So. 97, 99 (1901).
In 1950 this court almost decided the issue. In Interstate Oil Pipe Line Co. v. Guilbeau, Sheriff, 217 La. 160, 46 So.2d 113 (1950), the plaintiff-taxpayer paid under protest and sued the tax collector. The defendant tax collector answered plaintiff's appeal by asking that the judgment be amended by awarding 10% of the taxes as attorney fees, pursuant to Act 170 of 1898 and the provisions for payment under protest. The court declined because the tax collector had not demanded attorney fees in the lower court. On application for rehearing, the court stated that since costs had been awarded to the collector, he was fully protected, and the district court could include any attorney fees due in a judgment for costs (as was provided in § 56 of Act 170 of 1898).
The Company relies on two recent Court of Appeal cases in which this court denied writs: Parish of Calcasieu v. Traigle, Collector of Revenue, 296 So.2d 418 (La.App. 1st Cir. 1974), writ den. 303 So.2d 492 (La. 1974) and Colonial Pipeline Co. v. Traigle, Collector of Revenue, 353 So.2d 728 (La. App. 1st Cir. 1977), writ den. 354 So.2d 569 (La.1978). In the Calcasieu case the taxpayer sued for a refund of sales taxes paid under protest. One of several issues presented to this court in writ applications was the question of attorney fees. The taxpayer tendered a sum in payment under protest; the payment was returned in a letter from the attorney for the collector stating that the collector would accept a *1150 larger sum "without the imposition of attorney's fees provided in R.S. 47:512" providing notification of acceptance of the new figures was communicated and payment promptly made. The taxpayer complied, except that they paid under protest. The collector claimed the offer to waive attorney fees did not contemplate payment under protest and subsequent litigation. The court avoided ruling on the taxpayer's plea of "equitable estoppel" (transaction-compromise?) and held that R.S. 47:1512 imposed a penalty and should be strictly construed for the taxpayer.
In the Colonial case the taxpayer paid under protest and sued to recover, contesting the constitutionality of the tax. The collector, represented by full-time state lawyers, sustained the constitutionality of the tax in this court and the United States Supreme Court. The collector then reconvened for attorney fees, substituting private counsel. With one dissent, the Court of Appeal adopted the rationale of the Calcasieu case, denying attorney fees. We denied writs.
Chicago Bridge & Iron Co. v. Cocreham, 303 So.2d 750 (La.App. 1st Cir. 1974) (reversed on other grounds, 317 So.2d 605 (La. 1975)), decided the attorney fees question directly contrary to the decisions in Calcasieu and Colonial. L. A. Frey & Sons v. Lafayette Parish School Board, 262 So.2d 132 (La.App. 3d Cir. 1972) denied attorney fees when the taxes were paid under protest.
Because this court denied writs in the Calcasieu and Colonial cases, the Company relies on them heavily, without an attempt to explain the clear departure from the unbroken practice in Louisiana, under which the statutes provided and the courts consistently held that the losing taxpayer-litigant paid a percentage of the contested taxes for attorney fees of the collector. Such reliance upon the denial of writs by this court is misplaced. In the first place, this case represents the first occasion on which this court has examined the history of the statutes governing payment-under-protest and the payment of attorney fees of the collector. Second, a denial of writs by this court does not make law. "Our decision in this case is not controlled by our having refused to grant a writ of review in (another case). A refusal to review a judgment of one of the courts of appeal, even on the ground that we consider the judgment correct, is not necessarily an affirmance of all that is said in the opinion of the court of appeal." Rhodes v. Chrysanthou, 191 La. 774, 783, 186 So. 333, 336 (1939). In 1946 this court said: "The fact that we refused to review the judgment on the Court of Appeal . . . (in another case), relied on by the trial judge and wherein this act was differently construed, declaring, `Writ refusedthe judgment is correct,' did not mean that we thereby intended or that we did in fact approve the reasons given for such judgment or that they were correct. . . "Glassell, Taylor & Robinson v. John W. Harris Associates, 209 La. 957, 978, 26 So.2d 1, 8 (1946); Coco v. Winston Industries, 341 So.2d 332 (La.1977); see, 21 Loyola L.Rev. 835 (1975). "The refusal of writs by this Court, which is usually based upon incomplete records and ex parte applications and without hearing, is not decisional law." Garlington v. Kingsley, 289 So.2d 88, 91-2 (La.1974).
The Company argues that the imposition of attorney fees is a penal provision, and must be strictly construed. Its construction of R.S. 47:1512 is that, since the taxes were paid (under protest) they were not "referred to an attorney at law for collection," and, therefore, no attorney fees may be imposed.
Payment-under-protest pursuant to § 1576 reserves the right to the taxpayer to contest the legality of the tax recover the amount paid, with interest, if successful. The State does not have use of the funds (except to invest them); they must be segregated and held in escrow pending the outcome of the litigation. Nor does the taxpayer have the use of the money, although he is entitled to 6% interest on the sums recovered. Substantial benefits flow to the taxpayer paying under protest: distraint, summary proceedings to collect and *1151 ordinary suits are avoided, as well as the running of substantial interest and penalties imposed by the statutes on delinquent taxpayers. The collection, however, is not complete until a final judgment denying the taxpayer's prayer for the return of taxes paid under protest.
In view of the uniform history in this court of the imposition of attorney fees on the losing taxpayer, the Company's interpretation of § 1512 (that attorney fees may be imposed only when a tax is "referred to an attorney at law for collection") is unduly literal and restrictive. Regardless of the different statutory sources for the two sentences in § 1512, having been collected in the revised statutes of 1950 for the purpose of simplification and statutory revision, they must be read together.[8] The Collector is authorized, as he has always been, to employ private counsel to represent him in any proceeding, and if the proceeding results in the collection of taxes, the tax debtor must pay attorney fees for the collector.
The Company interprets § 1512 as if its only source was Act 157 of 1942. However, § 56 of Act 170 of 1898 (providing for 10% attorney fees for the collector in all proceedings (license taxes excepted) for the collection of taxes) continued in full force and effect until the enactment of the Revised Statutes of 1950. At least until 1950 the losing tax litigant in Louisiana was liable for attorney fees for the collector. The tables of the Revised Statutes of 1950 show that § 56 of Act 170 of 1898 was the source of R.S. 47:1998, which appears in Sub-Title III of Title 47, relating to ad valorem taxes. However, § 56 of Act 170 of 1898 had not previously been restricted to ad valorem tax cases, and by its terms applied to "all suits" and "all proceedings."
Since no policy changes (in the absence of incongruities) in the substance of the law were intended in the Revised Statutes of 1950, there is no support for the contention that R.S. 47:1512 was intended to change the law, awarding attorney fees to the collector only in cases in which taxes were "referred to an attorney at law for collection." There is no indication that the legislature, in the Revised Statutes of 1950, intended to change the consistent rule that the losing litigant in a tax case paid 10% of the taxes found due in the litigation as fees for the attorney employed by the collector to represent him in the litigation.
We find the arguments of the Company without merit. Parish of Calcasieu v. Traigle, Collector of Revenue, Colonial Pipeline Co. v. Traigle, Collector of Revenue and L. A. Frey & Sons v. Lafayette Parish School *1152 Board, all cited above, are overruled insofar as they are in conflict with this opinion.
The judgment of the Court of Appeal is reversed, and there is now judgment in favor of defendant, Mrs. Shirley McNamara,[9] Secretary, Department of Revenue and Taxation, rejecting the demands of plaintiff, South Central Bell Telephone Company, at its cost; there is further judgment in reconvention in favor of defendant and against plaintiff, South Central Bell Telephone Company, ordering it to pay the additional sum of $111,706.93 as attorney fees.
SANDERS, C. J., concurs in part and dissents in part with written reasons.
SUMMERS, J., dissents.
MARCUS, J., dissents and assigns reasons.
SANDERS, Chief Justice (concurring in part and dissenting in part).
This suit to recover utilities taxes paid under protest is an extremely close one. Ultimately, however, I concur in the judgment rejecting the taxpayer's demand for recovery of the taxes.
I disagree, however, with the assessment of attorney's fees against the taxpayer. In my opinion, the State is required to pay its own attorney's fees, when it defends a suit by a taxpayer to recover disputed taxes paid under protest.
It is well established that attorney's fees are not recoverable by a successful litigant in a civil action in the absence of a contract or statute. Smith v. Atkins, 218 La. 1, 48 So.2d 101 (1950); Rhodes v. Collier, 215 La. 754, 41 So.2d 669 (1949); Matthews v. Gaubler, La.App., 49 So.2d 774 (1951). In the present case, the question is whether there is a statute authorizing an award of attorney's fees to the State when it successfully defends a taxpayer's suit to recover taxes allegedly overpaid. I think not.
LSA-R.S. 47:1512 authorizes the assessment of attorney's fees against the taxpayer only when the State refers taxes asserted to be due to a private attorney "for collection." In that instance, penalties and interest may also be assessed. In the present case, the taxpayer paid the taxes. It is true that they were paid under protest, but the protest is of no consequence here.
LSA-R.S. 47:1576 authorizes the payment of taxes under protest and establishes the procedures for a suit for recovery. The statute authorizes no award of the defense attorney's fees. The purpose of this statute is to allow a taxpayer to test the correctness of the tax without being penalized either by imposition of interest or attorney's fees. If the rule were otherwise, a taxpayer could not afford to litigate small tax assessments, because the attorney's fees would amount to more than the tax itself.
I agree with the several decisions rejecting the State's claim for attorney's fees for the defense of these proceedings. See Colonial Pipeline Co. v. Traigle, La.App., 353 So.2d 728 (1977) cert. denied 354 So.2d 569 (La.1978); Parish of Calcasieu v. Traigle, La.App., 296 So.2d 418 (1974), cert. denied 303 So.2d 492; L. A. Frey & Sons v. Lafayette Parish School Board, La.App., 262 So.2d 132 (1972).
I would reaffirm the salutary rule.
For the reasons assigned, I concur in part and dissent in part.
MARCUS, Justice (dissenting)
I do not consider that "gross receipts" upon which the tax is computed include funds derived by South Central Bell from the sale of advertising in its directories. La.R.S. 47:1004 clearly provides that the tax is not based on all gross receipts, but only upon those derived from the portion of the business covered by La.R.S. 47:1003, namely, that portion concerning "any telephone line in this state with appliances for the transmission of messages by speech or sound, and engaged in the business of furnishing telephone service for compensation." Hence, the tax is imposed only on the public utility portion of the business.
*1153 South Central Bell is required to publish and distribute telephone directories annually as part of its telephone services; it is not required to provide advertising services. The furnishing of advertising is separate from that portion of the company's business dealing with the ownership and operation of telephone facilities and services. Thus, under the clear and unambiguous language of the statute, the revenue derived from this non-public utility portion of the company's business should not be included in the gross receipts upon which the tax is computed. Moreover, any ambiguity in the language of the statute should be construed in favor of the taxpayer. Accordingly, I disagree with the majority holding to the contrary.
Secondly, I disagree with the award of attorney fees to the collector. La.R.S. 47:1576 permits payment of taxes under protest. La.R.S. 47:1512 provides:
The collector is authorized to employ private counsel to assist in the collection of any taxes, penalties or interest due under this Sub-title, or to represent him in any proceeding under this Sub-title. If any taxes, penalties or interest due under this title are referred to an attorney at law for collection, an additional charge for attorney fees, in the amount of ten per centum (10%) of the taxes, penalties and interest due, shall be paid by the tax debtor. (emphasis added)
The majority holds that a person who pays taxes under protest shall be liable for attorney fees the same as a person who refused to pay taxes found due by the collector, thereby forcing the latter to refer the matter to an attorney for collection. In the instant case, the taxes were paid to the state, thereby precluding any necessity for, or even possibility of, referring the matter to an attorney for collection. The payment of taxes under protest, albeit a qualified payment, nonetheless remains a payment. The taxpayer relinquishes his right to the use and control over his money and retains only a claim for a refund in the event the tax is subsequently declared illegal. While the state is required to segregate the funds and invest them, it does not detract from the fact that it has possession and control over the funds. Moreover, the restriction imposed on the use of the funds is created by the state itself through a legislative act. I do not consider that a person should be penalized for exercising a legal right to pay taxes under protest. Additionally, imposition of attorney fees under this statute is in the nature of a penalty and thus should be strictly construed.
Accordingly, I respectfully dissent.
DENNIS, Justice, with whom TATE and CALOGERO, Justices, join, concurring in denial of rehearing.
I respectfully concur in the Court's decision to deny the parties' requests for a rehearing.
For the most part I continue to agree with the views expressed in our original opinion pertaining to the issue of attorney's fees. I particularly agree with its statement that the collection of taxes is not complete until the state obtains full use of the funds. After considering the briefs in support of plaintiff's application for a rehearing, however, I must express disagreement with the conclusion that every losing litigant in a tax case must pay 10% of the taxes as fees for the attorney employed by the Collector to represent him in the litigation.
As noted in our original opinion, La.R.S. 47:1512, in part, provides: "If any taxes, penalties or interest due under [title 47] are referred to an attorney at law for collection, an additional charge for attorney fees, in the amount of ten per centum (10%) of the taxes, penalties and interest due, shall be paid by the tax debtor."
The quoted statutory language is a restatement of subparagraph (b) of Section 4, Act 157 of 1942. See, La.R.S. 47:1512, Reporter's note on History and Source of Law. In its entirety Section 4 provided:
"(a) Penalties: When any taxpayer shall fail to make any return required to be made by said taxpayer under any State tax law at the time required therein, there shall be imposed, in addition to *1154 other penalties provided herein, a specific penalty to be added to the tax in the amount of five (5%) per centum if the failure is for not more than thirty (30) days, with an additional five (5%) per centum for each additional thirty (30) days or fraction thereof during which the failure continues, not to exceed twenty-five (25%) per centum in the aggregate. In the case of a false or fraudulent return where wilful intent exists to defraud the State of Louisiana of any State tax due under any State tax law, a specific penalty of fifty (50%) per centum of the tax shall be assessed.
"(b) Additional Penalty: If any delinquent tax imposed by any State tax law is referred to an attorney-at-law for collection there shall be added thereto an additional amount as a penalty, of ten (10%) per centum of the tax, interest and other penalties."
Section 4 of Act 157 of 1942, as a whole, indicates that a tax becomes delinquent when the taxpayer fails to make a return as required or makes a false return. Penalties were incurred for these derelictions and an additional penalty of 10% was charged if the delinquent taxes and penalties were referred to an attorney for collection.
The phrase, "taxes, penalties or interest due" was substituted for "delinquent tax" in La.R.S. 47:1512. Literally construed the statute now imposes a 10% penalty anytime a tax which is due is referred to an attorney for collection. However, a distinction still can be drawn between a tax which is "due" and one which has become "delinquent." The retention of the idea that the 10% penalty is an "additional" charge or penalty imposed when taxes and penalties are referred to an attorney for collection suggests that La.R.S. 47:1512, like its predecessor Section 4 of Act 157 of 1942, is applicable only to delinquent taxes. Moreover, some of the statutory assessment and collection procedures which afford the taxpayer delays within which to seek administrative relief suggest a distinction between delinquent and payable taxes. See, La.R.S. 47:1561-65. Cf. La.R.S. 47:2101.
It is difficult to believe that the legislature, by enacting La.R.S. 47:1512, intended to obliterate the distinction between taxes which are "due" and those which are "delinquent." For example, it would seem that taxpayers who pay under protest or acknowledge tax liability before any notice of assessment is filed against them should be treated less severely than taxpayers who file false returns or fail to file returns for substantial periods of time. A similar gradation is established with regard to interest and late payment penalties. La.R.S. 47:1601, 1602 and 1604. Furthermore, there appears to be no rational basis for a legislative intent to either impose or withhold the 10% surcharge, regardless of the circumstances, with respect to all taxes paid under protest.
In the instant case, however, it is not necessary to resolve all of the questions which are suggested by the statutes. No matter what else La.R.S. 47:1512 may require, surely it is intended that delinquent taxes referred to an attorney for collection shall cause an additional 10% penalty to be charged to the tax debtor. With regard to the transportation and communications utility taxes at issue here, La.R.S. 47:1006 specifically provides that the failure to timely file a report and accompany the report with payment of the tax due shall cause the tax to become "delinquent."[*] Any transportation and communications utility taxes not reported and paid when due therefore become delinquent and their referral to a private attorney will cause an additional penalty to be incurred.
*1155 The taxpayer in the present case failed to timely report and remit transportation and communications taxes due on the revenue from the "yellow pages" operation of its business for the tax years 1969 through 1972. In fact, the taxpayer also failed to report or pay such taxes for the tax years 1962-1968, but the taxes for these earlier years have prescribed and are not involved in this litigation. Accordingly, it is clear that the taxpayer must be charged with an additional penalty of 10%, or $111,706.93, on the above taxes which became delinquent and were referred to an attorney for collection.
On the other hand, the taxes which have become due after the initiation of the instant litigation were timely reported and paid under protest. Since La.R.S. 47:1006 provides that transportation and communications taxes become delinquent only upon a failure to timely report and remit the tax, the 10% penalty provided by La.R.S. 47:1512 is not applicable to these tax accruals.
In summary, La.R.S. 47:1006 expressly provides for delinquency of transportation and communications taxes upon failure to timely report and remit taxes; the 10% penalty of La.R.S. 47:1512 may apply only to delinquent taxes; and there is basis for a general distinction between "due" and "delinquent" taxes in the present statutory scheme. For these reasons I agree with the result reached in our original opinion but I respectfully disagree with its rationale which would impose an additional 10% penalty upon every losing litigant in a tax case.
In all other respects, I join in the refusal of a rehearing for the reasons stated in our original opinion.
NOTES
[1] R.S. 47:1001. "Every person owning or operating, or owning and operating, any public utility in this state as defined in this Part, shall, in addition to all other taxes and licenses levied and assessed in this state, pay a license tax, for the privilege of engaging in such business in this state, of two per centum (2%) of the gross receipts from its intrastate business." R.S. 47:1002. "This Part levies, in addition to other taxes and licenses levied in this state, a license tax on every person owning or operating or owning and operating a public utility, as herein defined, for the privilege of engaging in such business carried on wholly in this state, and not a part of interstate commerce. This tax is not intended to be a tax for the privilege of engaging in interstate commerce, nor is it intended to be a tax on the business of interstate commerce nor is it intended to be a tax having any relation to interstate or foreign business or commerce in which any such person, firm, association or corporation may be engaged in addition to its business in this state.

The provisions of this Part and the taxes collectible hereunder shall not apply to or be levied against gross receipts derived from any business or operations conducted on navigable waters of the United States."
R.S. 47:1003 in pertinent part provides:
"As used in this Part, the following words have the meaning ascribed to them in this Section, unless the context clearly indicates otherwise:
(1) `Public utility' means railroads and railways, sleeping cars, motor bus lines, motor freight lines, express companies, telephone companies, telegraph companies, boat or packet lines, and pipe lines, as herein defined.
(7) `Telephone companies' means any person, firm, association or corporation, domestic or foreign, owning and operating, or owning or operating, any telephone line in this state with appliances for the transmission of messages by speech or sound, and engaged in the business of furnishing telephone service for compensation.
(11) `Gross receipts' means the total amount of billings for services rendered, and all receipts from business beginning and ending within the state, except those for the transportation of passengers or freight or property originating at and destined to points within the corporate limits of the same city or town or within a seven mile zone adjacent to such city or town."
R.S. 47:1004. "The provisions of this Part shall apply to any person who is or may be engaged in any business, a portion of which is covered by or included in the various classes of business defined in R.S. 47:1003; but only upon the gross receipts derived from that portion of the business which is covered by or included in and not exempted by R.S. 47:1003 shall be subject to tax."
[2] "It having come to the Commission's attention that certain telephone companies operating exchange service within the State of Louisiana do not publish telephone directories, or do not revise their directories with sufficient frequency, and it being the opinion of the Commission that the publication of accurate and reasonably current directories is essential to the rendition of adequate and satisfactory telephone service, it is

ORDERED, that all persons, firms or corporations operating telephone exchange service within the State of Louisiana shall publish a directory of each exchange operated and distribute the same to the subscribers of such exchange at least once each year; and it is further
ORDERED, that two copies of each directory so published shall immediately upon publication, be filed with this Commission.
BY ORDER OF THE COMMISSION:
BATON ROUGE, LOUISIANA,
NOVEMBER 2, 1950."
[3] The special tax upon utilities began with Act 13 of the Regular Session of 1934 imposing a 2% tax on the gross receipts from the intrastate business of any public utility operating in this State, including telephone companies, with a declaration that it was not intended to be a tax on the business of interstate commerce. Act 26 of the Third Extraordinary Session of 1934 amended the earlier act of that same year by substituting for the term "intrastate business" the phrase "from the operation of its business in this State, as to business beginning and ending within this State," and "from all business passing through, into, or out of this State based upon the proportion of the mileage within this State to the entire mileage over which such business is done." This act also included definitions of terms: "telephone companies" was defined by the same language as in the present statute, and "gross receipts" was defined as "the total amount of billings for services rendered, and shall include all receipts from intrastate business, whether same be from the actual operation of such business or from a source incidental to such business."

The statute was again amended by Act 26 of the Second Extraordinary Session of 1935 to expand the definition of "gross receipts" to include proportionate intrastate mileage:
". . . the total amount of billings for services rendered, . . . shall include all receipts from business beginning and ending within this State, and a proportion, based upon the proportion of mileage within this State to the entire mileage over which such business is done, of receipts on all business passing through, into, or out of this State, whether same be from the actual operation of such business or from a source incidental to such business."
[4] The Company also contends that equal protection is denied to the Company if it has to pay the tax on the gross revenues from the sale of advertising in its telephone directories when its competitors, who are not public utilities, do not have to pay the tax on their gross revenue from the sale of advertising in their directories. As noted above, the tax involved here is not a tax on advertising, but a tax levied on the gross receipts for services rendered by one in the business of furnishing telephone service for compensation.
[5] R.S. 47:1512 provides:

"The collector is authorized to employ private counsel to assist in the collection of any taxes, penalties or interest due under this Sub-title, or to represent him in any proceeding under this Sub-title. If any taxes, penalties or interest due under this title are referred to an attorney at law for collection, an additional charge for attorney fees, in the amount of ten per centum (10%) of the taxes, penalties and interest due, shall be paid by the tax debtor." (Emphasis added).
[6] R.S. 47:1576 provides in part:

"A. A right of action is hereby created to afford a remedy at law for any person aggrieved by the prohibition of courts restraining the collection of tax, penalty, interest, or other charges imposed in this Subtitle. The person resisting the payment of any amount found due by the collector, or of enforcement of any provisions of this Subtitle, shall remit the amount found due to the collector and at that time shall give the collector notice of his intention to file suit for the recovery thereof. Upon receipt of this notice, the amount remitted shall be placed in an escrow account and held by the collector or his duly authorized representatives for a period of thirty days. If suit is filed within the thirty-day period for the recovery of such amount, the funds in the escrow account shall be further held pending the outcome of the suit. If the person prevails, the collector shall refund the amount to the claimant, with interest at the rate of six per cent per annum covering the period from the date the funds were received by the collector to the date of refund.
B. This Section shall afford a legal remedy and right of action in any state or federal court having jurisdiction of the parties and subject matter, for a full and complete adjudication of any and all questions arising in the enforcement of this Subtitle as to the legality of any tax accrued or accruing or the method of enforcement thereof. . . .
C. This Section shall be construed to provide a legal remedy in the state or federal courts, by action at law, in case such taxes are claimed to be an unlawful burden upon interstate commerce, or the collection thereof, in violation of any Act of Congress or the United States Constitution, or the Constitution of the state of Louisiana, or in any case where jurisdiction is vested in any of the courts of the United States."
[7] Section 56 of Act 170 of 1898 provides in part:

"That the attorney at law who represents the tax collector, or tax collectors in all proceedings for the reduction of assessments and collection of taxes (license taxes excepted), and in all injunction proceedings wherein the tax collector or tax collectors are sought to be restrained from the collection of taxes, shall receive a compensation of ten per cent on the amount collected, calculating same upon the aggregate amounts of taxes and penalties so collected as the result of aforesaid proceedings. The aforesaid commission to the attorney at law shall be paid by the party against whom the judgment is rendered in whole or in part, and shall be collected by the tax collector as costs at the same time that the taxes and other penalties are collected."
[8] Act 42 of 1942 stated:

"Be it enacted by the Legislature of Louisiana, that the Louisiana State Law Institute is hereby instructed to prepare a comprehensive revision of the statutes of the State of a general character, including those contained within the revision of 1870, to simplify their language, to correct their incongruities, to supply their deficiencies, to arrange them in order, the sections thereof being numbered so as to provide for additions and amendments, and to reduce them to one connected text with a view to their adoption, in accordance with the provisions of Section 24 of Article III of the Constitution of the State of Louisiana, as the Revised Statutes of the State."
In discussing the scope of the work, a reading of an extract of "Estimate of the Situation" presented to the council on December 8, 1945 introduces three possible methods that the council could have followed: (1) the preparation of a compilation which was nothing more than an arrangement of the existing statutes in some logical order; (2) a preparation of a revision and reform proposing changes; or (3) a revision in which manifest errors are corrected, obsolete, amended and repealed provisions are eliminated, and incongruities are removed. In May of 1947 the general membership of the council decided that the third method was the one to be followed: "The Revision is not to be a mere compilation of existing laws. Neither is it to embody policy changes in the substance of the law. Existing laws are to be worked into a consistent and logical pattern. Obsolete provisions are to be deleted, but only after a careful check as to any possible utility. Incongruities are to be resolved, but only after a careful analysis of the statutes involved and with a conscientious effort to effectuate the true legislative intent. The Revision will attempt, in many instances, to bring some semblance of order out of chaos; but it will not pattern that order upon the Reporters' or Council's concept of what the substantive law should be." Report to Accompany the "Project for Louisiana Revised Statutes of 1950," XIII.
[9] Joseph N. Traigle, the Collector of Revenue, was originally named as defendant; his successor, Mrs. Shirley McNamara, was later substituted.
[*] La.R.S. 47:1006, in pertinent part, provides:

"C. Payment of tax. Every such person who is required to submit a report, as provided in Subsection A of this Section, shall accompany the report by a remittance to the collector in lawful money of the United States, by certified check, or by any other means as may be authorized by the collector, of the amount of taxes herein levied and shown to be due by the report; that is, two per centum of the gross receipts of such business during the period covered by the report. Failure to timely file said report and accompany same with a remittance of the tax shown due shall cause said tax to become delinquent."